ELLA M. CARPENTER, Administratrix, Appellee, v. LOETSCHER-JAEGER MFG. CO., Appellant.

**MASTER AND SERVANT:** Tools, Machinery and Appliances—Negligence—Evidence—Sufficiency. Evidence reviewed, and held sufficient to justify a finding of negligence on the part of the master, (a) in failing to guard the counterweights on a freight elevator, (b) in the location of the electric switch controlling the electric current which moved the elevator, and (c) in failing to provide an indicator on the mechanism which operated the car, by which the operator would know whether it was safe to turn on the electric current. (See Section 4999-a2, Code Supp. 1913.)

**NEGLIGENCE:** No-Eyewitness Rule—Presumption—Effect. The presumption, in the absence of any eyewitness to an injury resulting in death, that deceased was conducting himself carefully, is substantive evidence that deceased was not guilty of contributory negligence, and renders such question one for the jury, unless the facts disclosed clearly negative the presumption. So held where deceased was killed by the counterweights on a freight elevator.

**NEGLIGENCE:** Contributory Negligence—Choice of Ways—Evidence. Evidence reviewed, in a case where deceased was killed by being caught under heavy counterweights on a freight elevator, while thereunder in an effort to turn on the electric current, and held to present a jury question on the matter of contributory negligence.

**NEW TRIAL:** Newly Discovered Evidence—Diligence. Newly discovered evidence is not sufficient ground for new trial, when the

same might easily have been learned from the same witnesses on the first trial, especially when, after the facts are discovered, there is further negligent delay in filing the affidavits in support of the motion.

*Appeal from Polk District Court.—W. S. AYRES, Judge.*

SATURDAY, MAY 13, 1916.

REHEARING DENIED FRIDAY, NOVEMBER 17, 1916.

ACTION to recover damages claimed to have resulted to the estate of which plaintiff is administratrix, occasioned by the death of the deceased, caused or brought about by the negligence of the defendant. The opinion states the issues and the facts. Verdict and judgment for the plaintiff below. Defendant appeals.—*Affirmed.*

*Clark, Byers & Hutchinson,* and *Harry N. Hansen,* for appellant.

*Dunshee & Haines,* for appellee.

GAYNOR, J.—The plaintiff, as administratrix of the estate of Samuel J. Carpenter, brings this action to recover damages, which, as administratrix, she claims to

1. MASTER AND SERVANT: tools, machinery and appliances: negligence: evidence: sufficiency.
have sustained by reason of his death. She bases her right to recover on the ground that his death was the proximate result of the negligence of this defendant.

It appears that the defendant is operating a manufacturing plant in the city of Des Moines; that the decedent was in its employ, and, among other things, it was his duty to use a certain elevator in transporting freight from one floor of defendant's factory to another; that the elevator used by deceased was what is known as a freight elevator, run by an electric motor, and with heavy iron counterweights. The elevator was located on the west side of the building, and

was about 12 by 20 feet in size, and ran from the basement up to the second floor. The motive power was controlled by a cable. If you wished to ascend, you pulled the cable down, and if you wanted to descend, you pulled the cable up. These counterweights ran between two posts, or guides; and, if the elevator ascended, the counterweights would descend. If the elevator descended, the counterweights would ascend. The distance between the guide posts, or uprights between which the counterweights ran, was about 18 inches. The guide posts were about 6 by 8 inches. They were located on the east side of the elevator, near the south end. To the north of the north guide post was located another post, upon the east side of which (being the side away from the elevator) was located an electric switch, which was used for the purpose of throwing on and off the current that operated the elevator. The switch, located on the posts aforesaid, was 5 or 6 feet from the floor. It had a lever, with which to throw the current on or off, and was operated by pushing the lever up or down.

There was no screen over the counterweights, but there was a railing on the elevator itself, which extended up 3 or 3½ feet from the floor of the elevator, and was sheeted up solid. The rope or cable with which the elevator was started or controlled was also on the east side of the elevator, near the south end, the longest distance on the floor of the elevator being from north to south. There was another railing on the floor of the building, which ran along the floor just east of the floor of the elevator, and east of the post which held the counterweights and the switch. This fence on the main floor was about 4½ feet high. There were three ways of reaching the switch, in turning on or off the current that moved the elevator. One was to go to the north side of the north guide post, and, standing on the floor of the elevator, reach around the north side to the east side of the post on which the switch was located, and pull the switch in or out, or pull it up or down. Another way was to go outside of the elevator onto the main floor, on the east side of the elevator, to the post to

which the switch was attached, and reach the switch from that point. The third way was to reach in under the counterweights between the guide posts and reach around the post on which the switch was situated, from the south, and thus manipulate the switch, while standing upon the floor of the elevator. The distance to be reached was practically the same in either case, when starting it from the floor of the elevator. The evidence discloses that, at this particular time, the switch could not well be reached by going out on the floor of the building and manipulating it from that point, because of the manner in which boxes and lumber had been piled on the east side of the elevator, and in the vicinity of the switch. There was another manner suggested by which the switch might be reached, and that was to go between the fence on the floor of the building and the railing on the elevator floor, and squeeze into the place where the switch was located on the post and manipulate it from that point.

This elevator was operated, as said before, by a device which consisted of a wire cable, which could be pulled up or down. The cable was about two thirds of an inch thick, with two buttons on it, about 10 inches apart. The buttons were about the size of a walnut, and fastened on the cable. Below the elevator, in the basement, were certain knives on a controller, which were thrown by the movement of the cable from one side to the other, so as to bring them in contact with certain metal clips, and, in this manner, the electric current was connected or cut off. If the knives were thrown over by the cable and were engaged in the clips on one side, the top button on the controller cable would have to be moved about 33 inches, to disengage the knives and take them through neutral and engage them on the other side. In order to disengage the knives from the clips sufficiently that the current would not pass through, the rope would have to be moved about 6 inches. After the knife was engaged in the clip, the controller cable could be moved only about an inch further, in the same direction in which it was being moved. The only

way the cable could then be moved was to pull it the other way. When the controller was neutral—that is, not engaged in either clip, and the current not connected—the top button of the cable was even with the top of the rail. The cable was operated about 16 inches west of the outside fence, being the fence on the floor, and just south of the south end of the inside fence, or the one on the elevator. When the floor of the elevator was even with the first floor of the building, the bottom of the counterweights was about one foot and one quarter of an inch above the top of the outside fence. The counterweights were about 2¾ of an inch thick, east and west.

With these conditions existing on the day of the accident, the elevator was brought to a position level with the first floor of the building, and a wagonload of lumber was driven on and unloaded, with a view to having decedent take the same up on the elevator to a gallery above the first floor. The lumber so unloaded was piled along the east side of the elevator to the height of about 2 feet, the south end of the pile being about even with the counterweights. The pile of lumber was approximately 16 feet long and 2 feet high, and extended west from the east side of the elevator, into and on the floor of the elevator, about 2 feet. The south end of the pile was from 18 inches to 2 feet north of the south end of the inside fence.

It appears that, when the wagon, with the load of lumber, was driven onto the elevator, the switch was thrown off; that is, the current that served as a motor power to the elevator was disconnected. It was thrown off by the use of the switch hereinbefore referred to. After the lumber had been unloaded, the evidence tends to show that the deceased took hold of the cable, with a view to starting the elevator, and pulled it once or twice. The elevator did not move. A witness who was present at that time asked him what the trouble was. He made no answer, and the witness went away. The witness had gone but a short distance when he heard deceased

call out.   He started back, and saw these heavy balancing weights across the deceased's neck and shoulders.   It appears that the elevator started up, the weights started down, caught the deceased, and he was dragged from the elevator down through the opening into the basement below, and was injured, and from these injuries died.   This witness testified that, when he last saw the deceased before he discovered him in this position under the weights, deceased was standing at the southeast corner of the elevator, with his hand on the controller rope; that, when he turned to throw off the switch, he saw the deceased with the weights across him, between his chest and his neck, and his face turned to the north.   The elevator was then going up.

Another witness testified that, when he first saw deceased, after he called for help, he was between these guide posts, under the weights, his feet sticking up between the guide posts, and the counterweights going down and pulling him over.   This controlling cable, situated near the southeast of the elevator, had nothing to do with pulling the car up or down.   Its purpose was to move the controller, and to put these knives in or out of the clip.   The power that moved the elevator was entirely derived from the current of electricity, when the connection was made by putting the knives in the clip.   When the knives are at what is called "center," that is, not in the clips, there is no connection of power.   They are then said to be neutral.   The pulling of the rope connects the power.   If one wants to ascend in the elevator, he pulls the cable down.   This connects the power, and causes the elevator to ascend.   If he desires to descend, he pulls up the cable.   This makes connection with the power, and causes the elevator to descend.   Whether the elevator ascends or descends depends on the way the rope is pulled.   This was also true of the balancing weights.   When the elevator ascended, the balancing weights descended, and vice versa.   There could be no movement until the power was turned on by use of the switch.

This record makes no question that something happened

to cause the elevator to ascend and the weights to descend, and that the deceased was caught under the descending weights and dragged down to his death. It appears that there was no railing or guard for these counterweights; that there was an open space above the railing that surrounded the elevator, and nothing to prevent anyone from being caught, if, peradventure, he got under or was thrown under these descending weights.

The first question presented for our consideration is: Does the evidence disclose such a state of facts that it can be said therefrom that the defendant was negligent in respect to the matters charged as constituting negligence, and was such negligence, if any, the proximate cause of the injury to deceased？

The court submitted but three grounds of negligence: (1) The failure to guard the counterweights on the elevator; (2) failure to provide an indicator on the cable, or otherwise, to show whether the knives were in such a position that the car would be caused to move up or down if the electric current was on; (3) whether or not the defendant was negligent in so locating the switch that it was necessary to reach under the counterweights to operate the same.

That the counterweights were unguarded, except as hereinbefore shown, is not in dispute. That there was no indicator to show whether the starting cable was in a position such that the car would be caused to move up or down when the electric current was turned on, may be considered in dispute. There is some question raised in the evidence as to the sufficiency of the buttons for this purpose. The jury could well have found that provision was not made for determining this matter with any degree of accuracy; that it could not be determined with any degree of accuracy from the provision made for that purpose; and that there were devices which could have been used, and were in use, by which the matter could be determined without the necessity of turning on the power to ascertain the fact. It appears that devices are

known which could have been used which would have indicated to an operator when the knives were at neutral, and when they were engaged. There is evidence from which the jury might have found that the location of the switch was such that, with the lumber piled in there as it was that day, it was reasonably necessary for the deceased to reach under the counterweights to operate the switch, after discovering that the current was not on.

The best that can be said for the defendant is that it left the operator three or four ways in which to operate this switch, and left to him the choice of ways by which that could be accomplished. That it was the duty of the deceased to turn on the switch so that he might proceed in the discharge of his duty to the defendant, is apparent. Lumber was piled on the floor of the elevator in front of the post upon which the switch was fastened. To reach it, the deceased would have to climb upon this lumber and reach out a considerable distance, to turn the switch from the north side of the post. The lumber was piled on the east side of the elevator within two feet of the south rail or fence. It is apparent that, of the three or four ways left open to the deceased to throw this switch, the one left most convenient and inviting was the one adopted by him. A jury might well have found that any one of the methods left open to the deceased (the one from the outside being obstructed) was attended with some peril. There was no danger to the deceased, in attempting to throw on this switch at a point under these weights, if the knives were at neutral. There is nothing in the record to indicate that the deceased knew, or had reason to believe, that they were not at neutral. There was nothing to show that, in the pulling of the rope before attempting to throw on the switch, it was not his purpose to put the knives at neutral. Defendant had furnished him no certain guide for ascertaining that fact.

The jury could well have found, under this record, and their finding would be justified by the evidence, that the deceased, when he pulled the rope, discovered that the power

was not on; that he then attempted to place the knives at neutral; that he believed that he had accomplished this before attempting to turn on the power. The evidence discloses that he pulled the rope more than once. Once would indicate to him that the power was not on. The second effort, it might be assumed in reason, was made for the purpose of placing it in a position so that the power might be turned on with safety. He is dead, and cannot speak for himself. The jury could assume, therefore, that he exercised that care for his safety, in respect to this matter, that a reasonably prudent man would exercise. There is no witness who can or does testify just what he did in the pulling of this rope. The witness who claims to have made some observation touching the use of the rope by the deceased, after the lumber had been piled and he was apparently ready to start up with it, says that he pulled the rope once or twice. Why twice? Once would have indicated that the power was not on. One pull would have made the contact which would indicate the absence of power. The jury might well assume that the second pull was to place it in neutral, before attempting to turn on the power. If the knives were not at neutral, and the deceased had gone out onto the main floor to turn on the switch, the car would have started immediately upon the turning of the switch, up or down, depending upon the position of the knives, with disastrous consequences, not, perhaps, to the deceased, but to the elevator and the property placed in his charge. If he had gone outside between the two fences and squeezed in there from the south to the north post and turned on the switch, there would have been no one to control the elevator, if the knives were in the clip and the power was turned on. It must then go up or down, unattended. The position that he assumed was nearest to the controlling cable—the cable, at least, by which he was then operating the car. Having placed the knives at neutral by the use of the controller rope, or assuming that he thought he had placed them there, exercising his best judgment on this point with the means at hand for

ascertaining the fact, it was then his duty to turn on the power. Assume that he did turn it on—although the evidence does not disclose this fact. definitely—and assume that he reached in under these weights for that purpose—although the evidence does not show that definitely—yet the jury could have found, under this record, that, as a reasonably prudent man, he believed, and had a right to believe, that no danger attended his act.

What is said here, however, has more relation to the question of contributory negligence than to the primary negligence of the defendant. On the question of defendant's negligence, the jury could have found—and their finding have had support in the evidence—that the defendant was negligent in placing the switch by which the power was turned on and off, at the point where this evidence discloses it was; that it was negligent in not boxing in these heavy ascending and descending weights; that it was negligent in not providing an indicator to show whether the starting cable was in such a position that the car would be caused to move up or down when the electric current was turned on. From all these facts, the jury could have found that the defendant was negligent in that it failed to furnish the deceased a reasonably safe place in which to discharge his duties.

It is elementary that it is the duty of the master to furnish the servant a reasonably safe place in which to discharge the duties assigned him. The duty assigned the deceased was to operate this elevator. On this day, before the lumber was brought on the elevator, the switch was turned off. By whom, it does not appear, nor does it appear that deceased had knowledge of this fact, although it does appear that it was customary to do that. Our statute provides that the owner or person having charge of any manufacturing or other establishment where machinery is used shall do certain things, specified therein, to make the place safe. The jury might well have found that it would be an easy matter for the defendant herein to enclose these heavy and dangerous weights by board-

ing up on either side of these guide posts; that such would have rendered the place safe from danger of these weights. It was the contact of these weights with deceased's body that caused his death. It is not necessary that we should go into a minute analysis of the testimony in this case, to find justification for the jury's verdict on the question of defendant's negligence. The record does not present it as a question of law, but as a question of fact, to be determined under well-settled rules of law; and we leave the discussion of the defendant's negligence on this point, without further comment.

We think the real controversy here is that involving the contributory negligence of the deceased. The instructions given by the court, we think, were a fair and full expression 2. NEGLIGENCE: no- of the law on this point, as laid down in eyewitness rule: *Kelly v. Chicago, R. I. & P. R. Co.*, 138 Iowa presumption: effect. 273, and *Gray v. Chicago, R. I. & P. R. Co.*, 160 Iowa 1, which have been followed by the later decisions of the court. Do the facts bring it within the rule?

Upon this question, we have to say that the evidence discloses that the deceased had been operating this elevator for some time prior to the accident. The record hereinbefore set out shows just what was being done on that 3. NEGLIGENCE: contributory day. There is no eyewitness as to what de- negligence: choice of ways: ceased did after he left the controller rope evidence. until he was seen under the heavy descending iron weights, being dragged to his death. There is no evidence as to how he got in between these weights, except the assumption that he was in the act of turning on the power. It was his duty to turn on the power, because it was his duty to convey this load of lumber to the upper floor. This could not be done without the power. The record discloses that the elevator was in good working order, and there can be no assumption from the record that the elevator started up without the direct interposition of someone. What the deceased did before attempting to turn on the power, after he left the controller rope, the evidence does not disclose. There is

no eyewitness to his conduct.  The inference is, from the known character of men to guard themselves from injury, that he was conducting himself carefully and prudently to that end.  This may be negatived, however, from the facts and circumstances disclosed.  This made it a jury question, unless the facts disclosed clearly negatived this presumption, or inference.  This inference of due care, where there is no eyewitness, does not change the burden of proof as to contributory negligence, but it has probative force, as an inference, on that question; and, unless destroyed by the proven facts and circumstances, still obtains in favor of the deceased.

There were really but two ways open to deceased to turn on the switch and start the elevator.  One was by going to the north side of the north guide post, reaching around to the south, and turning on the switch.  This would remove him several feet from the controller rope then used by him.  To accomplish this, he would have to climb on the pile of lumber placed on the east side, reach around, turn on the switch, and hastily scramble back to the controller rope; for it is certain that the elevator, upon being connected with the power, would go up or down.  He chose, if he did choose, to reach the switch from the point nearest the controller rope, then being used.  The jury could have found, recognizing the instinct of self-preservation, that he believed, and had reason to believe before so attempting, that the knives were not in contact with the clip, and that the turning on of the power by use of the switch would not move the elevator, and, therefore, not disturb the balancing weights, up or down.  This is too clear an inference from the facts disclosed for this court to interfere with the finding of the jury upon the question.  See *Korab v. Chicago, R. I. & P. R. Co.*, 149 Iowa 711; *Spaulding v. Chicago, St. P. & K. C. R. Co.*, 98 Iowa 205; *Hopkinson v. Knapp & Spalding*, 92 Iowa 328; *Burns v. Chicago, M. & St. P. R. Co.*, 69 Iowa 450; *Way v. Illinois Cent. R. Co.*, 40 Iowa 341.

It was for the jury to draw proper inferences from the

facts proven, touching the negligence of the defendant and the deceased's freedom from contributory negligence. This is peculiarly the province of the jury. Where reasonable minds, searching for the truth, might justly differ touching the proper inference to be drawn from proven facts, the conclusion reached by the jury will not be disturbed by this court. This rule has been too frequently announced and adhered to, to be now open to debate. We think, upon both propositions, the matter was properly left to the jury, and their finding is binding upon us.

We have examined the instructions asked by the defendant and are agreed that, in so far as they present correct propositions of law, they were covered by the instructions given by the court. We find further, upon an examination of the instructions given, that the complaint made of Instructions Nos. 10 and 12 is without merit, and we pass them without discussion.

It is urged by the defendant, however, that the court erred in overruling defendant's motion for a new trial, based on the ground of newly discovered evidence. The newly discovered evidence, upon which defendant claims the right to have the verdict set aside and a new trial granted, was exposed in the two affidavits filed by the defendant, one made by Albert Ditsworth, and one by J. G. Raitt. These affidavits tended to show that these witnesses were acquainted with the deceased, and had seen him on the day and immediately prior to the time he was killed; that they noticed his appearance, and, in, their opinion, he was under the influence of intoxicating liquor.

4. NEW TRIAL: newly discovered evidence: diligence.

Raitt testified that he smelled liquor on deceased's breath, and that he discovered by his manner that he was under the influence of liquor. Ditsworth's affidavit tended to show that, the day previous, or possibly two days previous to the accident, he observed that the deceased was drinking heavily; that he could tell this by his general appearance—the fact that he

was talkative; that, on the morning of the day when he was killed, he showed signs of having been drinking that morning; that witness smelled liquor on his breath. The witness was subpœnaed by both parties, and was present at the trial. The defendant's secretary and manager was also a witness on the trial; the attorney for the defendant had talked with Raitt prior to the trial, knew that he had worked with the deceased at the warehouse, and was working around close to him the greater part of the morning on the day he was killed; and they made no inquiry touching the matter now sought to be introduced. He also knew that the witness Ditsworth was working and was in close contact with deceased just prior to the time when he was killed; that he was within 18 or 20 feet of the elevator at the time the deceased was caught beneath the counterweights. All these facts were known to the defendant before the trial, or could have been ascertained by the slightest inquiry. Neither the defendant nor its officers nor its attorney seemed to have made any effort to secure this information, although it was a material matter to be shown on the question of deceased's contributory negligence. There seems to be, in the record, no satisfactory reason why inquiry was not made touching this matter, before the trial. If deceased was in the condition in which the witness Ditsworth testified he was, this fact must have been known to many people, and, we might say, known by all people who came in contact with him during the times testified to by witness in his affidavit. To permit defendant to have the trial set aside would be to put a premium on carelessness in the preparation of his suit for trial. If not known to the defendant before the trial, it is a fact of which it could have had knowledge by the slightest inquiry, if we give credence to the affidavits now offered in support of the contention for a new trial. See *Smith v. Wagaman,* 58 Iowa 11; *Marengo Savings Bank v. Kent,* 135 Iowa 386; *Rockwell v. Ketchum,* 149 Iowa 507; *Fanning v. McCraney,* 1 Morris 398; *Lindauer Bros. & Co. v. Hay,* 61 Iowa 663; *Carson v. Cross,* 14 Iowa 463.

Further, the trial was closed on the 16th day of February, 1914. A motion for a new trial was filed on the 7th day of March, 1914. The 37th ground of the motion as filed presents the question here under consideration. The affidavits to support the 37th ground were not filed until the 11th day of April, 1914, although the attorney for the defendant testified, upon the hearing upon the motion for a new trial, as follows:

"After the trial, probably the next day, or maybe two or three days, Mr. Raitt came to my office and said he had been subpœnaed by us on the trial; that he had been told by the clerk that he was entitled to one day's pay, and wanted us to pay the fee. I told him that we were not authorized by anyone to pay witnesses, but I would consult with Mr. Eddy, and if he wanted to advance the fee, we would let him have it in advance before the costs were paid, and he seemed to be irritated a little on account of the parties on the other side refusing to advance the fee, and said that there was other evidence that he considered very important that had not been brought out on the trial. I asked him what that was, and he said Mr. Carpenter had been drinking on the same day that he was killed."

Therefore, if defendant's contention now is true, it was informed of this evidence not later than the 19th day of February, and these affidavits were not filed in support of the motion until the 11th day of April, 1914, and no reason is assigned for not presenting them to the court sooner.

We think, under the whole record, the court did not err in overruling defendant's motion, based upon the claim of newly discovered evidence. Other errors are assigned, touching the introduction of testimony upon the trial. We have reviewed these with some care, and find no reversible error in the action of the court.

Upon the whole record, we think the cause must be, and is—*Affirmed*.

EVANS, C. J., LADD and SALINGER, JJ., concur.